# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Lori Irish,

Civ. No. 11-2703 (MJD/JJK)

        Plaintiff,

v.

United States Department of Justice,
Federal Bureau of Prisons, Officer
Pena, Lieutenant Duncan, Lieutenant
Omelson, Unknown Federal Bureau of
Prison Employees, and Officer G. Duffy,

**REPORT AND
RECOMMENDATION**

        Defendants.

Lori Irish, 3935 West Reno, Suite D, Las Vegas, NV 89118, *pro se* Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendants.

JEFFREY J. KEYES, United States Magistrate Judge

This case is before the Court on Defendants' Motion to Dismiss or for Summary Judgment (Doc. No. 42). The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636, and D. Minn. LR 72.1. For the reasons stated below, this Court recommends that Defendants' motion be granted.

## BACKGROUND

When Plaintiff commenced this action, she was serving a 60-month sentence in federal prison at Waseca, Minnesota ("FCI Waseca") for crimes that involved witness tampering, making threats against a federal employee, and

making threats in interstate commerce. Her projected release date for the completion of her term of imprisonment was September 4, 2012. Plaintiff's lawsuit presents five claims for relief, which are based on various incidents that occurred while she was confined at FCI Waseca. Her five claims are as follows:

(1) that Federal Bureau of Prisons ("FBOP") employees failed to provide adequate medical care to Plaintiff for injuries that she allegedly sustained when she fell out of her bed;

(2) that Plaintiff was not provided with an adequate law library at FCI Waseca;

(3) that an FBOP employee injured Plaintiff by forcing her to perform hazardous manual labor;

(4) that an FBOP employee violated Plaintiff's civil rights by cursing at her, and another FBOP employee violated Plaintiff's rights by threatening to place her in segregated confinement if she tried to prosecute an administrative claim against the employee who cursed; and

(5) that an FBOP employee violated Plaintiff's constitutional rights by forcing her to attend a deposition in a civil lawsuit, even though she had not been subpoenaed to testify.

(*See generally* Doc. No. 1, Compl.)

After Plaintiff's *pro se* Complaint was filed, it was reviewed pursuant to 28 U.S.C. § 1915. At that time, Defendants Warden Nicole English and Warden Rios were dismissed from the case and thus are no longer parties to this action. The remaining Defendants have now moved the Court to dismiss the action in its entirety pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or, in the alternative, to grant summary judgment pursuant to Fed. R. Civ. P. 56.

2

## DISCUSSION

## I.  STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6)[1] of the Federal Rules of Civil Procedure, the Court must accept as true all factual allegations in the complaint and view them in the light most favorable to the Plaintiff.  *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 740 (8th Cir. 2002).   In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged.  *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).   A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (stating that the court "may consider some materials that are part of the

---

[1]     Defendants also move to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1).   Dismissal pursuant to Rule 12(b)(1) is proper where an attack on the complaint's alleged basis for subject-matter jurisdiction reveals that there is no actual basis for jurisdiction.  *Wheeler v. St. Louis Sw. Ry. Co.*, 90 F.3d 327, 329 (8th Cir. 1996).   On a motion to dismiss under Rule 12(b)(1), a defendant may challenge the plaintiff's complaint either on its face or on the factual truthfulness of its averments.  *See Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993); *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).   In a facial challenge to jurisdiction, review is restricted to the pleadings and affords the non-moving party the same protections that it would receive under a Rule 12(b)(6) motion to dismiss. *See Osborn*, 918 F.2d at 729 n.6.

public record or do not contradict the complaint" (quotations omitted)).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. This standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Id.* at 556. "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Therefore, "[b]ecause vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.*

Whether a complaint states a claim is a question of law. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). In addition, this Court notes that *pro se* complaints are held to less stringent standards than formal pleadings drafted by lawyers. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). However, even a *pro se* complaint must allege facts, and not just bare, unsupported, legal conclusions. *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) ("Although it is to be

4

liberally construed, a *pro se* complaint must contain specific facts supporting its conclusions.").

When matters outside the pleadings, such as the materials submitted by Defendants in this motion, are considered by the court, a motion to dismiss for failing to state a claim is converted into a motion for summary judgment and considered in accordance with Fed. R. Civ. P. 56. Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009); *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 322; *Whisenhunt v. Sw. Bell Tel.*, 573 F.3d 565, 568 (8th Cir. 2009). The nonmoving party then must demonstrate the existence of specific facts in the record that

create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A nonmoving party cannot defeat a summary-judgment motion with unverified and conclusory allegations or by postulating evidence that might be developed at trial. Instead, if the nonmoving party bears the burden of proof on an issue, that party must present sufficient evidence to permit reasonable persons to draw different conclusions. *See* Fed. R. Civ. P. 56(c). If the moving party supports the motion with evidence, the opposing party must rebut it or the court can consider the fact undisputed. Fed. R. Civ. P. 56(e)(2). In other words, a party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247–49); *see also Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872–73 (8th Cir. 2005) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor."), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc). This standard applies equally to a *pro se* plaintiff, which is particularly germane here because Plaintiff did not respond to Defendants' motion with any showing that there is a genuine issue for trial on any of her claims. (*See* Doc. No. 50, Pl.'s Opp'n to Mot. to Dismiss or Summ. J ("Pl.'s

6

Opp'n")); see also *Ramirez v. Harmon*, No. 03-5284 (JRT/AJB), 2006 WL 2583106, *2 (D. Minn. Sept. 1, 2006) (stating that "the *pro se* plaintiff still must present evidence to defeat a properly supported summary judgment motion and may not rely upon conclusory allegations and unsupported assertions") (citing *Dunavant v. Moore*, 907 F.2d 77, 80 (8th Cir. 1990)).

## II. APPLICABLE LAW

### A. Federal Torts Claims Act ("FTCA")

As described below, Plaintiff seeks relief on her various claims under the FTCA. The United States, as sovereign, may be sued "only to the extent it has waived its immunity . . . ." *United States v. Orleans*, 425 U.S. 807, 814 (1976); *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Through the FTCA, Congress has waived the United States' immunity for certain claims, but this waiver is limited by the terms of the statute. *See* 28 U.S.C. §§ 1346(b)(1), 2671–2680; *Berkowitz v. United States*, 486 U.S. 531, 535–36 (1988). Moreover, the scope of a waiver will be strictly construed "in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996). The FTCA waives the sovereign immunity of the United States "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *see* 28 U.S.C. § 2674.

The individual FBOP employees who are named as Defendants in this action cannot be sued, as individuals, for their alleged torts under the FTCA. *See*

7

*Knowles v. United States*, 91 F.3d 1147, 1150 (8th Cir. 1996) ("When someone is injured by a tort committed by an employee of the United States who is acting within the scope of his employment, that employee cannot be sued."). The exclusive legal remedy available to a party who has been injured as a result of a tort committed by a federal employee is a claim against the United States itself, brought under the FTCA. *Id.* ("[T]he injured person must sue the United States which is liable in its employee's stead."). Because Plaintiff's Complaint alleges that the individual FBOP Defendants committed torts while acting as federal employees, and because Plaintiff has named the United States Department of Justice and the Federal Bureau of Prisons as Defendants, this Court construes, for purposes of this motion, Plaintiff's FTCA claims as claims against the United States itself. *See* 28 U.S.C. § 2679(d)(1); *see also Midland Psychiatric Assocs., Inc. v. United States*, 145 F.3d 1000, 1004 (8th Cir. 1998) ("[W]hen a federal employee is sued in tort, the United States is substituted as the defendant if the Attorney General certifies that the conduct giving rise to the lawsuit was within the scope of the employee's office or employment . . . .").

### B.    *Bivens*

An alleged victim of a constitutional error by a federal official must bring his or her claims pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which "is the federal analog to suits brought against state officials under" § 1983. *Hartman v. Moore*, 547 U.S. 250,

254 n.2 (2006).   Here, Plaintiff has brought her claims for monetary damages

arising from constitutional violations pursuant to *Bivens*.   Unlike an FTCA claim, a

*Bivens* claim cannot be brought against the United States or its agencies because

of sovereign immunity.   *Buford v. Runyon*, 160 F.3d 1199, 1203 (8th Cir. 1998).

Thus, a *Bivens* claim for monetary damages cannot be brought against individual

federal employees for actions in their official capacity because an official capacity

suit is treated as a suit against the United States.   *Id.* at 1201 n.3.   Therefore, to

succeed on her *Bivens* civil-rights claims, Plaintiff must prove that the named

individual Defendants violated her federal constitutional rights while acting under

color of federal law in an individual capacity.   However, the individual Defendants

may have qualified immunity from any such claims for damages if their conduct did

not violate a clearly established constitutional right that existed at the time of the

alleged wrongdoing.   *See Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004)

("Qualified immunity shields government officials from suit unless their conduct

violated a clearly established constitutional or statutory right of which a reasonable

person would have known." (quotations omitted)).

## II.   ANALYSIS OF PLAINTIFF'S CLAIMS

### A.   Alleged Failure to Provide Adequate Medical Care

#### (i)   Background

In her first claim, Plaintiff contends that after she fell from an upper bunk bed

"while she was a United States Marshal prisoner at North Las Vegas Detention

Center (NLVDC) in Nevada," the FBOP did testing on her "but refuse[d] to provide any medical care for Plaintiff." (Doc. No. 1, Compl. ¶¶ 11–12.) Plaintiff contends that she suffered from short-term memory loss as a result of the fall from the bunk bed, as well as brain damage, but the FBOP refused her treatment for her head injury after she arrived at FCI Waseca. In her Complaint, Plaintiff titles this cause of action as "Intentional or Negligent Infliction of Emotional Distress[;] Cruel and Unusual [P]unishment." (*Id.* at 4.) Defendants have responded to this claim by submitting the following unrebutted evidence about the medical treatment that Plaintiff received at FCI Waseca for her claimed memory loss.

When Plaintiff—who was diagnosed with Asperger's Syndrome, Substance-Induced Psychotic Disorder, Depressive Disorder, Adjustment Disorder, and Narcissistic Personality Disorder before she was confined—arrived at FCI Waseca on April 28, 2009, she asked prison officials for an assessment of her claimed short-term memory loss arising from her fall. Starting in May 2009, the FCI Waseca medical staff conducted a comprehensive assessment about Plaintiff's short-term memory loss. The assessment involved approximately thirty sessions, many of which included testing Plaintiff's memory. As a result of the testing, the psychology staff assessed Plaintiff's short-term memory as functioning in a low-to-average range, but the results established that she did not have severe impairment of her short-term memory. (Doc. No. 39, Declaration of Dr. Eric Evenson ("Evenson Decl.") ¶¶ 2–4.)

10

After the assessment was provided to Plaintiff, she became very upset and claimed that there was something wrong with the testing. The psychology staff then administered another test designed to measure short-term and delayed memory, but the results were regarded as invalid and not interpretable due to Plaintiff's lack of cooperation. (*Id.* ¶ 5.) Nevertheless, due to Plaintiff's complaints about memory loss, she was counseled by the psychology staff on how to improve her memory retention by using visual imagery, repetition, prioritization, and other learning skills. (*Id.* ¶ 6.)

On September 27, 2011, a psychologist did a formal psychological evaluation report concerning Plaintiff's complaint about short-term memory loss and concluded that Plaintiff was "deliberately fabricating and/or grossly exaggerating her symptoms." (*Id.*) And, based on his personal knowledge of Plaintiff, his review of her records, and his professional training and experience, Dr. Eric Evenson, the chief of psychology services at FCI Waseca, opines as follows:

> . . . I believe to a reasonable degree of professional psychological certainty and probability that the plaintiff received proper diagnosis and testing for her complaint about short-term memory loss that complied with the standard of care for diagnosis of her condition while she was confined at the FCI. I also believe to a reasonable degree of professional psychological certainty and probability that the plaintiff received proper treatment for her complaint about short-term memory loss because she was instructed on how to improve her memory retention and she was eventually diagnosed as malingering symptoms of short-term memory loss. Because a psychologist eventually determined that the plaintiff had engaged in malingering, I

believe to a reasonable degree of psychological certainty and probability that the plaintiff never suffered any clinically significant mental or emotional injuries as a direct result of the care she received to diagnose or treat her short-term memory loss condition. In addition, I believe that she never suffered from extreme, severe emotional distress that no reasonable person could be expected to endure as a direct result of the diagnosis and treatment efforts provided to her for her complaint about short-term memory loss.

(*Id.* ¶ 7.)

As noted above, Plaintiff did not respond to the evidence provided by Defendants in her reply to Defendants' motion. (*See* Doc. No. 50, Pl.'s Opp'n.)

### (ii)   FTCA Claim of Infliction of Emotional Distress with Respect to the Alleged Inadequate Medical Care

To prove her claim that Defendants intentionally inflicted emotional distress, Plaintiff would have to sustain the burden of proving that a defendant engaged in extreme and outrageous conduct that was "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community" and that this intentional or reckless conduct caused her severe emotional distress. *Hubbard v. United Press Int'l., Inc.*, 330 N.W.2d 428, 439 (Minn. 1983) (quoting *Haagenson v. Nat'l Farmers Union Prop. and Cas. Co.*, 277 N.W.2d 648, 652 n.3 (Minn. 1979). Plaintiff has submitted no more than unsupported allegations to support her FTCA claim that Defendants negligently or intentionally inflicted emotional distress by refusing to provide medical care for her memory loss. Defendants, on the other hand, have presented unrebutted evidence that they provided substantial medical care to Plaintiff for her memory loss, that their

diagnosis, testing, and treatment complied with the appropriate standard of care, and that Plaintiff was a malingerer. Further, there is no evidence in the record that Plaintiff suffered from extreme, severe emotional distress as a result of Defendant's treatment provided to Plaintiff. Therefore, based on the record before it, this Court concludes that there is no triable issue in this case concerning whether any Defendant intentionally inflicted emotional distress on Plaintiff.

Plaintiff's claim that Defendants negligently inflicted emotional distress must also fail for similar reasons. Negligent infliction of emotional distress requires that a plaintiff was within a zone of physical impact created by defendant and reasonably feared for her safety. *Engler v. Illinois Farmers Ins. Co.*, 706 N.W.2d 764, 767 (Minn. 2005). Defendants have presented evidence that their assessment procedures and treatment given to Plaintiff were appropriate, and that their test results did not indicate Plaintiff being in any physical danger. Plaintiff has presented no evidence that she was in a zone of danger of physical impact created by the Defendant. Because Plaintiff's claim remains unsupported, there is no issue of material fact that need be determined at trial, and Defendants' motion for summary judgment as to this claim should be granted.

### (iii)    *Bivens* Claim for Alleged Inadequate Medical Care

Plaintiff also asserts that her constitutional rights under the Eighth Amendment to be free from cruel and unusual punishment were violated because she did not receive medical care for her short-term memory loss. In the face of

13

Defendants' unrebutted evidence about the substantial medical care received by Plaintiff for her alleged short-term memory loss, this Court concludes that Plaintiff cannot establish that any of the Defendant officials were deliberately indifferent to her serious medical needs.

In *Langford v. Norris*, 614 F.3d 445 (8th Cir. 2010), the Eighth Circuit summarized the deliberate indifference standard that applies to a prisoner's claim for inadequate medical treatment:

> It is well established that "[d]eliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment." *See Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). "To show deliberate indifference, plaintiffs must prove an objectively serious medical need and that prison officials knew of the need but deliberately disregarded it." *Id.* (citing *Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005)). Prisoners may prove deliberate indifference by showing that the total deprivation of medical care resulted in "pain and suffering" or "a lingering death." *Estelle*, 429 U.S. at 103, 97 S. Ct. 285. But a total deprivation of care is not a necessary condition for finding a constitutional violation: "Grossly incompetent or inadequate care can [also] constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment." *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (citations omitted). To state a claim based on "inadequate medical treatment . . . [t]he plaintiff 'must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Alberson v. Norris*, 458 F.3d 762, 765 (8th Cir. 2006) (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)).

*Langford*, 614 F.3d at 459–60. In other words, "[a] prima facie case alleging deliberate indifference requires the inmate-plaintiff to demonstrate that . . . [he]

suffered from an objectively serious medical need and the prison officials actually knew of but deliberately disregarded that need." *Popoalii v. Corr. Med. Servs.,* 512 F.3d 488, 499 (8th Cir. 2008) (quotations omitted). And a serious medical need is "one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Vaughn v. Greene Cnty., Ark.*, 438 F.3d 845, 851 (8th Cir. 2006) (quoting *Pool v. Sebastian Cnty., Ark.*, 418 F.3d 934, 944 (8th Cir. 2005).

Plaintiff has submitted no evidence that prison officials deliberately disregarded her medical needs arising from her bed fall and subsequent claimed memory loss. In fact, the evidence reflects that she received substantial medical care. She had numerous assessment sessions with the psychology staff; they gave her a course of treatment to assist her; they gave her a battery of tests; and a formal psychological evaluation report was done. Plaintiff's claim that she was provided with no medical care for her alleged memory loss is untrue.

At most, Plaintiff's complaint appears to be that she disagreed with the psychology staff's assessment and course of treatment. But a prisoner's difference of opinion over matters of expert medical judgment or a prescribed course of treatment does not rise to the level of a constitutional violation. *Randall v. Wyrick*, 642 F.2d 304, 308 (8th Cir. 1981). "Prisoners do not have a constitutional right to any particular type of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). And "[p]rison officials do not violate the Eighth Amendment

when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." *Id.* Here, Plaintiff's mere contentions that she received inadequate treatment, without more, are insufficient to form a constitutional violation. And given the complete lack of evidence to support her claims of deliberate indifference, Plaintiff's claims of inadequate medical treatment cannot survive summary judgment. *See Popoalii*, 512 F.3d at 499–500 (stating that plaintiff had the serious medical condition of cryptococcal meningitis, but where she presented no evidence to show that the defendants were more than grossly negligent, and the facts in the record did not rise to the level of deliberate indifference, summary judgment in favor of defendants was upheld).

Moreover, "[w]hen an injury is sophisticated, proof of causation generally must be established by expert testimony." *Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002). "A causal connection between an event and an injury may be inferred in cases in which a visible injury or a sudden onset of an injury occurs. However, when the injury is a sophisticated one, *i.e.*, requiring surgical intervention or other highly scientific technique for diagnosis, proof of causation is not within the realm of lay understanding and must be established through expert testimony." *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1210 (8th Cir. 2000); *see also Alberson v. Norris*, 458 F.3d 762, 765–66 (8th Cir. 2006) ("Where the complaint involves treatment of a prisoner's sophisticated medical condition, expert testimony is required to show proof of causation."). Here, Plaintiff's

16

medical condition of short-term memory loss was sophisticated.   And Plaintiff

produced neither expert testimony nor documentary evidence to support her claim

that the treatment provided by the FCI Waseca medical staff was constitutionally

inadequate.   Defendants, on the other hand, have provided declarations attesting

that the treatment provided by FCI Waseca for Plaintiff's claimed short-term

memory loss was adequate.   "In the face of medical records indicating that

treatment was provided and physician affidavits indicating that the care provided

was adequate, an inmate cannot create a question of fact by merely stating that

she did not feel she received adequate treatment."   *Dulany v. Carnahan*, 132 F.3d

1234, 1240 (8th Cir. 1997).   Because Plaintiff has not met her burden by showing

that there is a genuine issue of fact regarding causation or deliberate indifference,

Defendants' motion for summary judgment should be granted dismissing Plaintiff's

*Bivens* claim for alleged inadequate medical care.

### B.    Lack of Adequate Law Library Claim

In her second claim for relief, Plaintiff alleges that her constitutional right of

access to the courts was violated because the law library at FCI Waseca was

inadequate.   She asserts that she had several civil cases involving the National

Labor Relations Board "both before the Board in Washington, DC and before the

Ninth Circuit Court of Appeals[, and that] [t]he FBOP denied [her] access to NRLB

law."   (Doc. No. 1, Compl. ¶ 20.)   In her reply to Defendants' summary-judgment

motion, Plaintiff also complains that the FBOP did not provide her with Minnesota

state law in the prison law library.   (Doc. No. 50, Pl.'s Opp'n 2.)

When this Court dismissed Defendants Warden English and Warden Rios,[2] it found that Plaintiff had failed to plead an actionable claim for denial of access to the courts, because she had not identified any "actual injury" caused by the alleged lack of an adequate law library.   Nothing has changed since the remaining Defendants moved for summary judgment.   Plaintiff has not, in her response to the summary judgment-motion, come forward with any identification of any actual injury caused by the alleged lack of an adequate law library.   *See Lewis v. Casey*, 518 U.S. 343, 349 (1996) (stating that a prisoner lacks standing to bring an access-to-the-courts claim, unless he can show some "actual injury"); *see also White v. Kautzky*, 494 F.3d 677, 680 (8th Cir. 2007) ("To prove a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim . . . , which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim."); *Klinger v. Dep't of Corr.*, 107 F.3d 609, 617 (8th Cir. 1997) ("In *Lewis v. Casey*, the Supreme Court held, based on principles of standing, that actual injury must be proven in order to prevail on an access-to-courts claim.").   An inmate

---

[2]   Previously, the Court dismissed the only two individuals mentioned in the Complaint about this claim, Warden Rios and Warden English, because Plaintiff failed to describe any specific personal wrongdoing be either of them.   Plaintiff did not amend her Complaint to specify any wrongdoing by English or Rios, nor did she, in her response to Defendants' summary-judgment motion, specify any individual wrongdoing by any person in connection with this claim.

cannot bring an "access to the courts" claim unless she pleads (and ultimately proves), that she has been deprived of some specific opportunity to defend herself, or to advance a viable legal claim, in some particular action.  *Lewis*, 518 U.S. at 351; *Sabers v. Delano*, 100 F.3d 82, 84 (8th Cir. 1996) (per curiam).

In her Complaint, Plaintiff alleges only that she has had some unidentified matters before the National Labor Relations Board and the Ninth Circuit Court of Appeals.   But there are no allegations showing (or even suggesting) that Plaintiff lost some specific legal right or defense in any of those matters as a direct result of some particular law library inadequacy.   Therefore, Plaintiff has failed to satisfy the "actual injury" requirement prescribed by *Lewis v. Casey*.   *See Sabers*, 100 F.3d at 84 (stating that an access-to-the-courts claim was properly dismissed where the prisoner "offered no facts" showing that the alleged lack of legal resources actually "prejudiced her in a legal case").

Moreover, the legal matters described in Plaintiff's Complaint are not alleged to have any direct bearing on the legality or the conditions of her confinement.   As the Supreme Court explained in *Lewis v. Casey*, the constitutional right of access to the courts –

> does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims.   The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.   Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional)

19

consequences of conviction and incarceration.

518 U.S. at 355 (emphasis in the original).   Therefore, Plaintiff's argument that she could not adequately prepare her Complaint in this case because the "BOP does not provide any [Minnesota] state law . . . in the library" (Doc. No. 50, Pl.'s Opp'n 2), is unpersuasive.   Although prison officials must ensure that prisoners have the resources needed to attack their sentences and to challenge their conditions of confinement, there is no constitutional requirement that the government must enable prisoners to "discover grievances[] and to litigate effectively once in court" in a civil case for monetary damages, such as this one, which is based in part on state-law tort claims.   *See Lewis*, 518 U.S. at 354 (emphasis omitted).   Based on the above, Defendants' motion for summary judgment as to Plaintiff's inadequate-library claim should be granted.

## C.   Work-Related Injury Claim

In her third claim for relief, Plaintiff contends that she was subject to cruel and unusual punishment when "Lieutenant Omelson made her jump down 7 ft. window wells to pick up trash," when "Plaintiff was then pulled up by [her] arms over the railings[,]" and when she was denied medical treatment for back, neck, shoulder, and head pains arising from the incident.   (Doc. No. 1, Compl. ¶¶ 25–27.)   Specifically, she asserts that she was denied medical treatment for ten days after the incident even though she was in extreme pain and, after that, she was told that she had to buy pain medicine at the prison commissary even though she was

20

indigent.  (*Id.* ¶¶ 27–28.)   Plaintiff bases this claim on both the FTCA (alleging the torts of intentional or negligent infliction of physical harm and intentional or negligent infliction of emotional distress), and *Bivens* (alleging cruel and unusual punishment in violation of the Eighth Amendment).

Turning first to the FTCA claim, "when a federal prisoner's injuries are work-related, . . . the prisoner's exclusive remedy against the government is the Inmate Accident Compensation Act."   *Smith v. United States*, 561 F.3d 1090, 1099 (10th Cir. 2009) (citing *United States v. Demko*, 385 U.S. 149, 152–54 (1966)); 18 U.S.C. § 4126.   Section 4126 of Title 18 of the United States Code broadly applies to pay "compensation to inmates or their dependents for injuries suffered . . . in any work activity in connection with the maintenance or operation of the institution in which the inmates are confined."   18 U.S.C. § 4126(c)(4).   While ordinarily the compensation arises from an injury during an inmate's "regular work assignment," "injuries suffered during the performance of voluntary work in the operation or maintenance of the institution, when such work has been approved by staff, may also be compensable."   28 C.F.R. § 301.301(b); *see also Smith*, 561 F.3d at 1099 (stating that the plaintiff's injury was work-related because he received a work order from a supervisor); *Baynes v. United States*, 392 F. App'x 334, 335–36 (6th Cir. 2008) (stating that regulations define what is "work related").

Plaintiff alleges that her injury was not work related because she was not paid for the eight hours of work that was involved, the FBOP did not fill out the

required injury paperwork for the day the injury occurred, and she never worked

the job that resulted in the injury either before or after the day of the injury.   She

claims that she was assigned the window-well-cleaning duty as a punishment for

not getting along with her roommate.   (Doc. No. 1, Compl. ¶¶ 25, 29.)

Defendants, however, have submitted the following evidence, which supports that

the window well cleaning was, in fact, an extra duty work assignment.   First,

Defendant Lieutenant Omelson testifies as follows:

> I worked at the FCI on March 29, 2010, as a Lieutenant from 6:15a.m.
> to 2:45p.m.   I was advised by employees that the plaintiff and
> another inmate had engaged in disruptive conduct that affected the
> orderly operation of the housing unit where they were confined at the
> FCI.   In lieu of issuing the plaintiff and the other inmate formal
> incident reports for their disruptive conduct, I advised them that they
> could informally resolve the potential disciplinary matter if they
> voluntarily agreed to perform extra duty.   Informal resolution of a
> disciplinary matter is authorized by 28 C.F.R. 541.14.   Both the
> plaintiff and the other inmate voluntarily agreed to perform extra duty
> to avoid formal disciplinary proceedings.   Picking up trash in the
> window wells was common and regularly done.   I was unaware of
> any injuries occurring from such duties. Ladders were also available
> to complete assigned duties.
>
>         . . . .
>
> . . . I was never deliberately indifferent to a serious risk of harm to the
> plaintiff's safety.   Prior to March 29, 2010, the plaintiff did not have
> any specific medical restrictions that prevented her from working as
> an orderly at the FCI.   The plaintiff had received job orientation
> instructions and safety information on how to properly perform her
> work duties.   I never instructed the correctional officer who
> supervised Irish to force her to jump off the top of the railing into the
> window well.   The correctional officer who monitored Irish while she
> performed her extra duty work assignment contacted me after Irish
> completed her extra duty work assignment and advised me that Irish

> completed the work assignment.   The officer never advised me that
> Irish complained of physical injuries that occurred while she worked
> and the officer never advised me that she performed the work
> assignment in an unsafe manner.

(Doc. No. 40, Decl. of Pamela Omelson ("Omelson Decl.") ¶¶ 7, 12.)   In addition,

as Defendants point out, the record reflects that Plaintiff herself characterized her

back injury as work related.   For example, on April 27, 2010, Plaintiff reported to

the medical staff:   "I have continually back, knee, leg, arm problems from work

related injury of jumping down 10 feet window wells."   (Doc. No. 34, Exhibit List,

Ex. 5 at 13 of 81.)   And when she was treated for an injury on July 27, 2010, she

reported the following to health services:   "I am still having terrible pain with my

back, knee, shoulder, and neck from work related injury.   I have no pain pill refills

left."   (*Id.* at 3 of 81.)   In response to Defendants' summary-judgment motion,

Plaintiff has put forth no evidence to show that her injury resulted from a

non-work-related incident.   Therefore, this Court concludes that the unrebutted

evidence in the record shows that there is no triable issue over the fact that the

injury was work related and that Plaintiff cannot maintain a claim under the FTCA

because her exclusive remedy against the government is the Inmate

Compensation Act.

Plaintiff's Eighth Amendment claim of inadequate medical treatment for her

pain arising out of this injury should also be dismissed.   As explained above, in

order for Plaintiff to prevail on an Eighth Amendment claim for inadequate medical

treatment, Plaintiff would have to demonstrate that an individual Defendant knew

of but deliberately disregarded her serious medical needs.   But Plaintiff has failed

to identify anyone who deliberately disregarded her medical needs.   The only

person identified by Plaintiff who had any involvement in this incident is Lieutenant

Omelson, a supervising correctional officer who is responsible for maintaining

security and good order at the prison.   The unrebutted evidence of record shows

that she had nothing to do with the provision of medical treatment to Plaintiff:

> To the extent the remaining allegations in the third claim for relief
> could be construed to allege that I failed to provide medical care for
> the plaintiff's injuries that occurred when she performed the extra duty
> work assignment/I deny the allegation.   I never prevented the plaintiff
> from obtaining medical care and treatment for injuries that she
> allegedly suffered while she worked on her extra duty work
> assignment.   As noted previously, I never was responsible for
> providing medical care and treatment for the plaintiff and I relied upon
> the licensed and trained medical professionals employed by the BOP
> at the FCI to provide proper care for the plaintiff's injuries.   In
> addition, I did not work on March 30, 2010, April 3, 2010, April 4, 2010,
> and April 10, 2010.   I was in training on March 30, 2010, and also
> from April 5, 2010, to April 9, 2010.   I never had an opportunity to
> interact with the plaintiff on days when I did not work and I was in
> training.   The plaintiff never contacted me on March 31, 2010, or on
> April 1 and April 2, 2010, to complain about denial of medical care and
> treatment for her work related injuries.

(Doc. No. 40, Omelson Decl. ¶ 13.)

Moreover, Defendants have submitted medical records that show that

Plaintiff in fact received extensive medical treatment for her back injury, including

records showing that she was treated by medical professionals on April 7, 2010,

April 27, 2010, May 19, 2010, June 16, 2010, July 27, 2010, and August 20, 2010.

(Doc. No. 34, Exhibit List, Ex. 5.)   These records show that throughout the relevant period of time, Plaintiff was treated with various pain medications and physical therapy.   Plaintiff does not dispute these records.   Therefore, because Plaintiff has thus come forward with no evidence in response to Defendants' summary-judgment motion to show that any Defendant in this case was deliberately indifferent to Plaintiff's serious medical needs and thus inflicted cruel and unusual punishment on Plaintiff, there is no issue of material fact to be tried as to this claim, and Defendants' motion should be granted.

### D.   Alleged Retaliation from Reporting Sexual Abuse

Plaintiff alleges that at some unidentified time she was called a derogatory term in the Spanish language by Defendant Officer Pena (Doc. No. 1, Compl. ¶ 34 ("Plaintiff was called a pinche guera (f[***]ing white bitch) by Officer Pena.").)   She asserts that she complained about this to the Warden at FCI Waseca and nothing was done.   She also asserts that thereafter Defendant Lieutenant Dunkin coerced her into dropping her complaint about Officer Pena's conduct by threatening to confine her in the Special Housing Unit ("SHU") if she did not drop her complaint. (*Id.* ¶ 35.)

Defendants have submitted the following unrebutted evidence in support of their motion for summary judgment on this claim.   At FCI Waseca, in November 2010, Plaintiff accused Officer Pena of "sexual abuse."   (Doc. No. 39, Evenson Decl. ¶ 10.)   On November 18, 2010, Dr. Eric Evenson, Chief of Psychology

25

Services at FCI Waseca, and Lieutenant Dunkin, Special Investigation Supervisor at FBOP, met with Plaintiff to investigate the claim. (*Id.* ¶¶ 10–12.) During the meeting, Plaintiff stated that Officer Pena made the derogatory remark, quoted above, about a year before. (*Id.* ¶ 10.) Plaintiff told Dr. Evenson that, when the statement was made, she did not understand it was derogatory because it was spoken in Spanish. (*Id.* ¶ 11.) Plaintiff also stated that Officer Pena did not touch her in an inappropriate way and he never sexually assaulted her. (*Id.*) During the meeting, Plaintiff did not explain why she had waited a year to make the claim. (Doc. No. 36, Declaration of Tony Dunkin ("Dunkin Decl.") ¶ 10.) In addition, although Plaintiff identified two inmates who she stated could corroborate her claim, those inmates did not corroborate that Officer Pena made the statement. (*Id.*) Lieutenant Dunkin then explained the consequences that would occur if it were determined that Plaintiff's allegation was false, and Plaintiff affirmed that she wanted her complaint to remain active. (Doc. No. 39, Evenson Decl., Attach. A at Evenson_00042.) However, after she was being escorted to the SHU that same day, Plaintiff changed her mind and indicated she wanted to withdraw her allegation of sexual abuse against Officer Pena. (*See* Doc. No. 39, Evenson Decl. ¶ 14 and Attach. A at Evenson_00042.) Several months after this meeting, and after Plaintiff's brother had written to the Office of Inspector General requesting protection for Plaintiff, Lieutenant Dunkin interviewed Plaintiff on May 19, 2011, to determine whether she feared for her safety. (Doc. No. 36, Dunkin

26

Decl. ¶ 12.)   At that time, Lieutenant Dunkin advised Plaintiff about authorized protective custody, but Plaintiff stated that she did not fear for her safety, and she was not confined in the SHU at that time.   (*Id.*)

Further, contrary to Plaintiff's allegation that she was coerced into dropping her complaint about Officer Pena's conduct, the records submitted by Defendants show that Plaintiff did, in fact, later pursue her complaint, not only about Officer Pena's derogatory remark, but also about Lieutenant Dunkin's alleged threat to confine her in the SHU if she did not drop her allegations.   She made her request for administrate remedy concerning these matters on June 3, 2011.   (Doc. No. 35, Decl. of Becky Bobo ("Bobo Decl.") ¶ 6.)   On June 22, 2011, the Warden responded to the request and advised Plaintiff that her allegations were investigated, but that she did not provide sufficient evidence to prove there was any retaliation against her.   (*Id.*)   Plaintiff then appealed the Warden's response to the Regional Director and requested that Officer Pena be fired from his job and prosecuted; the Regional Director responded on August 2, 2011, and stated that Plaintiff's allegations had been forwarded to the appropriate authority for review, but that the results of the investigation into prison staff misconduct would not be disclosed.   (*Id.* ¶ 6, Attach. A.)   After that, Plaintiff attempted to file an appeal with the General Counsel from the Regional Director's response; however, this appeal was rejected because Plaintiff did not provide a copy of the required documents. (*Id.*)

Plaintiff also identifies two additional incidents in her Complaint that she claims were harassment in retaliation for her making complaints: (1) that she was not allowed to see her son for a period of time because of the delay in adding her son to her visitor list; and (2) that she was denied transfer to a FBOP prison facility in Nevada that was closer to her son.   (Doc. No. 1, Compl. ¶ 36.)   Defendants point out, however, that the FBOP has authority to preclude visitation with an immediate family member.   (Doc. No. 38, Decl. of Grant Duffy ("Duffy Decl.") ¶ 8.) And here, Plaintiff's records indicated that before she went to prison she had been charged with child abuse and endangerment for tying her son's hands behind his back with computer cables and hitting him.   (*Id.*; Doc. No. 36, Dunkin Decl. ¶ 7.) When Plaintiff arrived at FCI Waseca, she did not deny the events, rather she stated her son had lied and injured himself.   (Doc. No. 39, Evenson Decl., Attach. A at Evenson_00002.)   Consequently, the FBOP investigated the situation, and ultimately, Plaintiff's son was added to Plaintiff's visitation list.   (Doc. No. 38, Duffy Decl. ¶ 8.)

In response to Plaintiff's claim about not being transferred to a facility closer to her son, Lieutenant Dunkin declares that he had no involvement in the denial of the transfer request, and the National Inmate Appeals Administrator concluded that Plaintiff was appropriately designated to serve her term of imprisonment at FCI Waseca based on her classification.   (Doc. No. 36, Dunkin Decl. ¶ 9; Doc. No. 38, Duffy Decl. ¶ 10.)   Grant Duffy, Correctional Counselor at the FBOP, also

28

declares that he did not violate the Plaintiff's rights in this regard, and explains, "Because the plaintiff was appropriately designated and she has no protected right to serve her term of imprisonment in a specific prison, a legitimate, non-retaliatory reason existed for her to remain confined at the FCI."  (Doc. No. 38, Duffy Decl. ¶¶ 7, 10.)

This Court concludes that all of Plaintiff's retaliation claims arising from the incident between Officer Pena and Plaintiff should be dismissed.  As best this Court can tell, this would include Plaintiff's contentions that: (1) Defendants Pena and Dunkin, in their official capacities, intentionally and negligently inflicted emotional distress upon her, and thus she has a claim for monetary damages under the FTCA against the United States; (2) Defendants Pena and Duncan, acting in their individual capacities, violated her Eighth Amendment right to be free of cruel and unusual punishment, and thus she has a *Bivens* claim for monetary damages against them; and (3) she was the victim of whistleblower and sexual harassment in violation of federal law.

Plaintiff's FTCA claims for infliction of emotional distress should be dismissed because Plaintiff has not come forward with any evidence to counter Defendants' ample proof that no one inflicted emotional distress upon her. Plaintiff has not come forward with any evidence that any individual Defendant engaged in such extreme and outrageous conduct that would rise to the level of the type of conduct necessary to prove the essential element of this tort claim.

Even if Officer Pena called Plaintiff a "f[***]ing white bitch" in Spanish, this does not rise to the level of atrocity required for this tort claim. And Plaintiff has not submitted any evidence that Lieutenant Dunkin or any other Defendant engaged in any outrageous conduct to inflict emotional distress on Plaintiff in retaliation for her complaint about Officer Pena. She has not countered Defendants' submissions that show that she was never threatened with placement in the SHU to coerce her into dropping her complaint, and she has not countered Defendants' submissions that show that the prison officials' decisions concerning visitation by her son and the denial of her transfer request were unrelated to her complaint about Officer Pena. Further, as far as the tort of negligent infliction of emotional distress is concerned, the record submitted by Defendants shows that Plaintiff was never within a zone of physical impact created by any Defendant and she never reasonably feared for her safety. In fact, the evidence submitted by Defendants indicates that Plaintiff admitted that Officer Pena never touched her and that she did not fear for her physical safety. This evidence remains unrebutted.

Similarly, Plaintiff's claim that her Eighth Amendment right to be free from cruel and unusual punishment was violated also fails because none of the conduct of Officer Pena or Lieutenant Dunkin rises to the level of conscience-shocking conduct that could raise constitutional concerns. "After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S.

312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)) (internal quotation marks omitted).   Officer Pena's derogatory comment does not qualify as the type of sufficiently serious sexual harassment that could give rise to an Eighth Amendment violation, and Plaintiff has not provided any evidence that she was in pain as a result of either Officer Pena's or Lieutenant Dunkin's conduct.   *See Freitas v. Ault*, 109 F.3d 1335, 1338 (8th Cir. 1997) ("To prevail on a constitutional claim of sexual harassment, an inmate must . . . prove, as an objective matter, that the alleged abuse or harassment caused "pain" and, as a subjective matter, that the officer in question acted with a sufficiently culpable state of mind."); *see also Orange v. Ellis*, No. 08-224-JVP-DLD, 2009 WL 454253, at *3 (M.D. La. Feb. 23, 2009) (concluding that calling an inmate a snitch and bitch was verbal abuse that did not give rise to an Eighth Amendment claim); *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) ("Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment.").

Further, Plaintiff has failed to respond to Defendants' proof that no prison official took any retaliatory action against Plaintiff because she engaged in constitutionally protected conduct when complaining about Officer Pena's conduct.   *See Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007) (stating that to succeed on a retaliation claim, Plaintiff must prove that she "engaged in constitutionally protected activity and that [D]efendant[], to retaliate for the

protected activity, took adverse action against [her] that would chill a person of ordinary firmness from engaging in that activity"). Based on the record presented, this Court concludes that Defendants never took any action against Plaintiff that would qualify as the type of adverse action that could give rise to a constitutional claim. Plaintiff was not placed in the SHU because of the complaint she made about Officer Pena; indeed, she rejected the offer of protective custody. The delay in visitation rights for her son was for good reason because of the criminal charges of child abuse that had been filed against her. *See Overton v. Bazzeta*, 539 U.S. 126, 133–35 (2003) (maintaining internal security and protecting child visitors from harm are rationally related to a limitation of visitation rights). The denial of Plaintiff's request for transfer to a prison camp in Nevada was not an adverse action because inmates cannot choose which facility will house them. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976) (stating that "[t]ransfers between institutions . . . are made for a variety of reasons and often involve no more than informed predictions as to what would . . . best serve institutional security or the safety and welfare of the inmate," and concluding that "the Due Process Clause in and of itself [does not] protect a duly convicted prisoner against transfer from one institution to another"); *Bazzetta v. McGinnis*, 430 F.3d 795, 804 (6th Cir. 2005) (stating that a prison inmate does not have a liberty interest in a transfer). And the FBOP is authorized by statute to house prisoners wherever it is appropriate and suitable, and here the record reflects that the FBOP concluded that FCI Waseca

32

was appropriate and suitable for Plaintiff.  *See* 18 U.S.C. § 3621(b) ("The Bureau may designate any available penal or correctional facility . . . that the Bureau determines to be appropriate and suitable[.]"); (Doc. No. 36, Dunkin Decl. ¶ 9; Doc. No. 38, Duffy Decl. ¶ 10.)

In addition to above, Plaintiff's claims of whistleblower and sexual harassment retaliation should also be dismissed because Plaintiff did not exhaust her administrative remedies before commencing this action.  To exhaust administrative remedies at FCI Waseca, an inmate must try to informally resolve an issue, request a remedy from the Warden, and appeal a denial of the request to the Regional Counsel and with the General Counsel/National Inmate Appeals Administrator.  *See generally* 28 C.F.R. § 542.10 et seq.; (Doc. No. 35, Bobo Decl. ¶¶ 2–4.); s*ee also Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.").  Plaintiff initiated the administrative remedy process by filing a claim that "an employee called [her] a derogatory name and continued to sexually harass her . . . [and] a Lieutenant coerced her into dropping her complaint about the employee's conduct by threatening to confine her in the Special Housing Unit (SHU) if she did not drop her complaint."  (Doc. No. 35, Bobo Decl. ¶ 6.)  Plaintiff was denied any remedy by the Warden and she appealed to the Regional Director.  (*Id.*)  Although

Plaintiff then presented an appeal to the General Counsel/National Inmate Appeals Administrator, it was rejected because she did not submit proof that she had exhausted the lower levels of review. (*Id.*, Attach. A at BOP_00049.) She was informed that she could resubmit her appeal within fifteen days with the necessary proof (*id.*), but she did not correct the error. Therefore, Plaintiff failed to exhaust her administrative remedies on her claim for sexual and whistleblower harassment retaliation, and her claim should be dismissed.

### E. Claim Regarding Deposition

In her fifth claim for relief, titled "Intentional or Negligent Infliction of Emotional Distress, Whistleblower Harassment and Threats of Retaliation, Cruel and [U]nusual [P]unishment," Plaintiff has sued Defendant Officer Grant Duffy for monetary damages because he allegedly "forced Plaintiff to go to a civil deposition against her will." (Doc. No. 1, Compl. ¶ 47.) Plaintiff asserts that she was not ordered by a court to attend a civil deposition, nor was there a subpoena served upon her. (*Id.*) She says that she told Officer Duffy, who is a correctional counselor for the FBOP at FCI Waseca, that she did not want to go to the deposition, but Officer Duffy told her that "unless she went to the deposition she would be put in the 'SHU' (24 hour lockdown)." (*Id.* ¶¶ 48–49.) Plaintiff therefore went to the deposition. (*Id.* ¶ 49.) Plaintiff further contends that she was told that she would be allowed to leave the deposition if she told the opposing attorney that she would not testify without her attorney present. (*Id.* ¶ 50.) But she asserts

that "the deposition record shows that [she] was not allowed to leave [the] deposition as promised and was continually harassed by opposing counsel." (*Id.* ¶ 51.) Plaintiff also contends that Officer Duffy testified against her at the deposition. (*Id.* ¶ 49.)

In support of their motion for summary judgment, Defendants have submitted the following evidence: (1) a notice of the taking of the oral deposition of Plaintiff in a civil case pending in the United States District Court for the District of Nevada in which Plaintiff was a party, issued on October 6, 2010; (2) documents indicating that the deposition was scheduled to be held at FCI Waseca on October 21, 2010; and (3) documents indicating that the attorney who was taking the deposition was Keith Deike, an attorney in Waseca, Minnesota, who arranged the logistics of taking the deposition at the prison with Officer Duffy. (Doc. No. 38, Duffy Decl., Attach. C.) The record also reflects that Warden English approved the entry of attorney Deike and a court reporter for the deposition and approved their bringing the necessary stenographic machine and other necessary equipment for the deposition. (*Id.*) The Warden's approval also required that the attorney and the court reporter be escorted to the deposition by Officer Duffy. (*Id.*) In addition, Defendants have submitted Officer Duffy's declaration in which he declares that prior to the deposition he checked with the prison's legal department and was told that the deposition should go ahead because it had been approved. (Doc. No. 38, Duffy Decl. ¶ 12.) Officer Duffy declares that he never

threatened to confine Plaintiff in the SHU if she did not attend the deposition. (*Id.*

¶ 13.) He also declares –

> The plaintiff had no protected right to avoid the deposition after the
> visit with attorney Deike was authorized. The deposition transcript
> establishes that I merely identified the plaintiff on the record at the
> request of attorney Deike and I never testified against her on any
> substantive matters. I never was personally involved in harassing
> the Plaintiff during the deposition and I never prohibited her from
> leaving the deposition after it concluded.

(*Id.*)

Defendants have also submitted the deposition transcript as support for their

motion. (*Id.*, Attach. B.) The transcript shows that immediately upon entering

the room where the deposition was going to be held, Plaintiff said that she was not

going to say anything without an attorney and that the deposition was finished.

(*Id.*, Attach. B at 3.) Plaintiff was not even sworn in as a witness. (*Id.*) Attorney

Deike then requested that Officer Duffy enter the room so that he could identify

Plaintiff, on the record, and confirm that she was seated in the room. (*Id.* at 3–4.)

The record shows that Officer Duffy did this and then left the room. (*Id.*)

Attorney Deike then made a record in which he informed Plaintiff that he had

contacted her attorneys of record but had been informed that they no longer

represented Plaintiff in the action. (*Id.* at 4–5, 8.) During this time, Plaintiff made

the accusation that Officer Duffy and attorney Deike were harassing her and stated

that the deposition was finished. (*Id.* at 6–8.) Then, she started to sing "da, da,

da, da, da, da, da." (*Id.* at 8.) Attorney Deike told Plaintiff that if he was not

contacted by an attorney representing Plaintiff by November 5, then he would ask the Court to issue an order compelling the deposition to go forward. (*Id.* at 8.) Officer Duffy then "got [Plaintiff] out of there pretty much as soon as [he] could[.]" (Doc. No. 38, Duffy Decl. ¶ 12.)

As with the other claims described above, Plaintiff has not responded to the evidence submitted by Defendants that shows that neither Officer Duffy nor any other Defendant intentionally or negligently inflicted emotional harm upon her. Consequently, her tort claim under the FTCA cannot survive. Further, neither Officer Duffy nor anyone else at the prison engaged in the type of outrageous conduct that could be construed as intended to inflict substantial emotional harm on Plaintiff. The unrebutted evidence submitted by Defendants shows that all that happened here was that the prison officials, after receiving a lawful notice of the taking a deposition in a case in which Plaintiff was a party, arranged for the deposition to take place in a conference room at the prison. As the record demonstrates, Plaintiff refused to testify and all that Officer Duffy did was to identify her for the record. As far as the claim for negligent infliction is concerned, the unrebutted evidence shows that Plaintiff was never put in any danger of physical injury, so this claim fails as well.

Next, with respect to the deposition at issue, Plaintiff has no *Bivens* claim against Officer Duffy, or any other Defendant, because there was no violation of her Eighth Amendment right to be free from cruel and unusual punishment.

37

Officer Duffy's arranging of the deposition, escorting Plaintiff to the deposition, identifying her on the record, and then escorting her out of deposition, do not constitute conduct that shocks the conscience in such a fashion that it would rise to a constitutional violation.

Finally, Plaintiff has no plausible claim about "whistleblower, harassment and threats of retaliation" in connection with the deposition incident. Plaintiff has not set forth any plausible claim that she was sexually harassed by Officer Duffy in any manner whatsoever. And she sets forth no facts to suggest that she was retaliated against because she engaged in a constitutionally protected activity. The closest that Plaintiff comes to a claim that any adverse action was taken against her at all is her assertion that Officer Duffy testified against her in the deposition, but this claim is belied by the deposition transcript that shows that all that Officer Duffy did was to identify Plaintiff for the deposition record. Further, Plaintiff's claim that Warden English and other unidentified prison officials are liable for Officer Duffy's alleged civil-rights violation under the doctrine of respondeat superior is meritless. This Court already dismissed Warden English as a party to this case because respondeat superior does not apply to *Bivens* civil-rights claims of this sort. The same holds true for the unidentified other prison officials. As the Supreme Court plainly stated in *Iqbal*, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676.

## CONCLUSION

In her response to Defendants' motion, Plaintiff requests that "if this court feels that my complaint is inadequate that it allow me to amend the complaint and allow me time to find an attorney." (Doc. No. 50, Pl.'s Opp'n 1–2.) Plaintiff has not explained to the Court how an amendment of the Complaint would cure the fundamental deficiencies in her case that compel dismissal. And Plaintiff has not shown good cause for why the Court should delay this matter to give Plaintiff time to find an attorney. For all the reasons stated above, Defendants' motion to dismiss or for summary judgment should be granted.

## RECOMMENDATION

Based upon the foregoing and all of the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendants' Motion to Dismiss or for Summary Judgment (Doc. No. 42), be **GRANTED**; and

2. This case be **DISMISSED WITH PREJUDICE**.


Date: January 3, 2013

*s/ Jeffrey J. Keyes*
JEFFREY J. KEYES
United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 17, 2013**, a writing which specifically identifies those portions of this

Report to which objections are made and the basis of those objections.   Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.   A party may respond to the objecting party's brief within **fourteen days** after service thereof.   All briefs filed under this rule shall be limited to 3500 words.   A judge shall make a de novo determination of those portions of the Report to which objection is made.   This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.